May it please the court my name is Brandy Barth and I am honored to be here on behalf of appellant Cornell McKay. Jean Doe was robbed at gunpoint in the Central West End in August on August 10th 2012. Her cell phone and $50 in cash was taken. The suspect was a tall thin young black male. On August 18th 2012 Megan Bokin was murdered in the Central West End three blocks from where Jean Doe was robbed. The murderer was attempting to rob Megan Bokin and take her cell phone. He killed her with a small silver handgun. A small silver handgun had also been used in the robbery of Jean Doe just eight days earlier. The suspect in the murder of Megan Bokin was a tall thin young black male. These two fact patterns are important because the same person that murdered Megan Bokin during an attempted robbery is the same person that robbed Jean Doe on August 10th 2012. That person is a man named Keith Esters and he is currently serving time for the murder of Megan Bokin. We are here today because the defendants recklessly and intentionally charged Cornell McKay with the armed robbery of Jean Doe. He spent three years behind bars for a crime that he did not commit. We are here because the defendants knew for certain as of August 22nd 2012 that Keith Esters was the true perpetrator of the armed robbery of Jean Doe and not Cornell McKay. What establishes that in our record? On August 22nd of 2012, a homicide detective who was investigating the murder of Megan Bokin called Detective Bodenheimer and Detective Rudolph and said you need to come to the police station right now because there's a Detective Bodenheimer and Detective Rudolph appeared at the homicide division and Detective Jerome Jackson testified under oath that he told Bodenheimer and Defendant Rudolph, there's a woman in here named Kalen Perry who knows who did the robbery you're investigating. You need to talk to her. Jerome Jackson testified under oath that he told Bodenheimer and Rudolph on her live-in boyfriend of the time Keith Esters had robbed the cell phone and $50. He said he made that statement specifically to them. Now what happens next is again part of the reason why we're here. Detective Bodenheimer and Detective Rudolph went into the homicide room where Kalen Perry had been being interviewed by Detective Jackson. We know that those interviewees. I don't understand why that's really part of what's here you haven't gotten to the basically substantive, mostly substantive due process. You know what happened in the interview and that the interview was lost and so forth is doesn't establish anything from the standpoint of the 1983 claim. The 1983 claim is for a reckless investigation that led to the the eventual imprisonment of Cornell McKay. So the investigation is the 1983 violation. Is that a substantive, what constitutional right is that is being claimed? Under 1983, the 14th amendment, it's a due process violation and under White v. Smith of the 8th Circuit of 2012, they said a reckless investigation can amount to a deprivation of due process. No it's the right to be free from imprisonment. That's not in the Constitution. It's not Fourth Amendment, it's not Eighth Amendment, it's not Fifth or Sixth. If it's if it's substantive due process and then we have to factor in conscious shocking. Yes your honor I'm sorry you're correct it is conscious shocking. The reckless investigation has to amount to conscious shocking. Yes you're correct your honor. A non-textual right in the Constitution. You're right and under White v. Smith, the 8th Circuit held that 696 Fed 3rd 740, they held that a reckless investigation can amount to a violation of your substantive due process rights. So how can it be conscious shocking when Jane Doe identifies McKay in a lineup? Because your honor, Detective Bodenheimer testified to this. That was the only piece of proof and his training was that witness identification particularly of opposite race is not very reliable. And so what Detective Jackson also testified to was that he would never charge an individual based solely upon an identification. And every Detective Jackson who's the homicide correct and he's never he's never prosecuted anyone based on solely on an eyewitness investigation. But he testified that was based upon his training. He would never charge an individual or arrest an individual based solely on an eyewitness investigation. So any police officer that doesn't follow that that script is guilty of conscious shocking investigation? What we also have you have to put everything together. Yes but everything the most to me the most dominant fact is that Jane Doe never backed off on her investigation and neither did her husband. Even after she had had an opportunity sometime later to to to view Esker in a lineup. And she said something like there's some similarity but that's not that's not the guy. Right and how would she know to pick out Keith Esters as the person to differentiate between him and Cornell McKay? Because they were they were following up. But how would Jane Doe know to pick out the true perpetrator of her crime and say he looks similar but these are the reasons why it's not him? No bearing on substantive conscious shocking investigation whatsoever. If you don't have malice or something akin to malice I get give me give me a the white I didn't go back and read white I'm sure I have in the past. Nobody recovers under this claim virtually. So so no one can recover under. It is huge boulder to roll up a steep hill. And and that's why I'm trying to explain the investigation that happened. And so when you're talking about a huge boulder you have the detective who knew the only thing he had was a stranger identification so it's not someone that they knew. He wasn't investigating the Jane Doe robbery right? Yes he was. I thought he was investigating the murder. So so Boedingheimer was investigating the robbery and we know that Boedingheimer talked to Kaylin Perry who told him that her boyfriend Keith Esters had robbed the cell phone and $50. And she knew that as of August 22nd 2012. Twelve days after the robbery. So I believe that is conscious shocking. And that he didn't put that in the police report until months later. And then when he finally put it in the police report he didn't say what Kaylin Perry had actually said. What was Jackson investigating when he interviewed Perry? Detective Jackson was investigating the murder of Megan Doe who was the robbery victim. Was it the incomplete records that Jane Doe had provided? Or some more complete? No he had the ones that Jane Doe had provided at the time. And at the time. Incomplete according to your that's one of your claims. So we find out later that there is actually a phone call 30 minutes after the robbery made to Kaylin Perry. So Jackson gets a investigating one crime gets information that seemed Correct. He was told who did the Jane Doe robbery. Not relevant information. Kaylin Perry wasn't there. She was the one using Jane Doe's cell phone. It could have been in a trash can. I mean you know she's not nearly as good a witness as Jane Doe is. I disagree. Kaylin Perry lived. I'm not saying the investigation looks perfect. The district court didn't think it was. Yes. But is it is it is it recklessly and consciously deficient? I believe I would assert that if the person who is in exclusive control of the cell phone and not just the cell phone that could have been found in a trash can. She also said that he had $50. So unless the person the real person who committed the crime also threw away the $50 that she got with the cell phone. I don't think that's really reasonable. So and not to mention he had the silver handgun. I think Jackson did the right thing in referring it to the people investigating the. And Jackson's not a defendant. We believe that Jackson did do the right thing. It's Bodingheimer and Rudolph who did not. The fact that they knew as of August 22nd that the person who was in exclusive control of the profits of the crime said that her live-in boyfriend is had robbed the cell phone and $50. The defendants admitted that in their depositions? Kaylin. Detective Jackson. No, not Jackson. I'm worried about the defendants. They did not admit that she said that Jane Doe's cell phone. He admitted that they said the cell phone, but she didn't use the person's name as if the person who robbed someone knows the person's name. Do you have Perry's testimony in this record? Yes. She said repeatedly that Keith Esther's robbed the cell phone and $50. She used the word his self. That is what she said repeatedly. She testified that she told that to the defendants. Yes. She didn't know who the defendants. She did not remember the police officer's names. She said that every police officer she spoke to, that's what she said. What I was going to say about Detective Jackson, the reason we know that Detective Bodingheimer knew this information was because Detective Jackson testified that he told Bodingheimer that information. And Kaylin Perry's interview with Detective Jackson was recorded. So we know what she told Detective Jackson because it's on a recorded interview. So we know that she said that to Detective Jackson. Suddenly, in the same room that Kaylin Perry had been being interviewed by Detective Jackson, every interview is recorded. When Detective Bodingheimer and Rudolph go in to interview her, suddenly that tape recording is missing. No one knows where it is. And so, yes, I think it is conscious shocking that as of August 22, 2012, you know that there's a woman in a room who has just admitted that her boyfriend murdered Megan Bokin, that he had been going around committing armed robberies, stealing women's cell phones, said that, yes, he had committed the robbery of the cell phone that she had been using and $50. And Bodingheimer and Rudolph leave the room, do not include the statement in their police report. It's not amended until months and months later. And then, they don't even interview Keith Esters. And he was at the police department at the time. How about the factor that the prosecutor knew all this and defense counsel knew all this? And what White v. Smith says is, it doesn't matter. A police officer who completes a reckless investigation cannot shield themselves from their wrongful acts based upon their statements and reckless investigation that led to the prosecution. So, you cannot shield yourself from your unconstitutional behavior because the prosecutor continued on with an investigation based upon a police report that you created and brought to them. What does the record show that the prosecutor knew about the Perry interviews? The prosecutor knew, the record does not show that they had reviewed the homicides tapes, but they were aware of Kaylin Perry and Keith Esters during that prosecution. Ms. Barth, you're in your rebuttal time. You can continue. I'm sorry. Thank you. We're sure you can. Thank you, Your Honor. I'm going to reserve my rebuttal. Good morning, Your Honors. May it please the Court, my name is Melanie Penica. I represent the police defendants. You don't have to speak up. Your Honors, if I could, I guess, initially take you through just a timeline of the investigation since that seems to be the issue. On August 10th of 2012, Jane Doe was robbed. She immediately reported the robbery to the St. Louis Metropolitan Police. A sergeant, patrol officer, two detectives and an evidence tech appeared at the scene and investigated. Jane Doe described her robber. We have read all the briefs. We haven't got that much time. When it comes to what was known when and whether the investigation was reckless or somehow  Why did Jane Doe come to view a line-up of Esker? What happened was, after the robbery, when McKay was identified, there was a photo line-up, and then later there was an in-person line-up. She identified McKay as a robber both times very strongly. I understand that, but it was some months later. Some months later. How did it come about, in the course of these investigations and prosecution, that she was asked to look at a line-up that included Esker? Was it the prosecutor that did that? No, it was Bodinger and Rudolph. Why did they say that? Because when they had gone to retrieve the cell phone from the gas station where it had been sold, they retrieved the cell phone. The person who had bought the cell phone identified Esker as a robber. I want to know, in terms of the prosecution, was McKay... What was the status of the McKay prosecution when Doe did the Esker line-up? He had been indicted. He was indicted on October 9, 2012. Was Defense Counsel a part of this? No, of Doe's view of Esker in a line-up. I'm sorry, what was the question? Was Defense Counsel involved? I believe Defense Counsel was involved. Yes. Well, I don't know if Defense Counsel was involved in the line-up. That would suggest that everyone, post-indictment but pre-prosecution, was aware of these various unknowns and uncertainties. Even pre-indictment, everyone was aware because McKay's Defense Counsel was actually with the detectives when they interviewed the alibi witnesses that McKay had given. So Defense Counsel was involved from a few days after McKay turned himself in on August 21st. So Defense Counsel had all this information and was kind of a part of everything. In February of 2013, after Bodinger and Rudolph became aware of Esker's and his connection, they arranged for a photo line-up where Esker's was one of the persons in the photo line-up. And at that point, in February of 2013, Doe identified, she indicated some recognition perhaps of Esker's, but then she differentiated him from her robber by talking about his skin color, his eyebrows were different. There were all different things that she said, no, my robber's McKay, the person I identified before, this person kind of resembles, but here's why it's different. Here's why this isn't the person. She's never wavered on her identification. Not one time she's never recanted or wavered. Was all this thrashed out at the criminal trial? Yes. Well, depending on what you mean by all. Well, basically attempting to prove that it was Esker and not McKay. Did all that come out at trial? The criminal trial judge would not let in the alternative suspect theory, and I believe that's one of the reasons that the criminal case was reversed. But Perry testified at the criminal trial for McKay, and she wasn't allowed to say the name of Esker's, her boyfriend, but she was there testifying at the criminal trial. So everybody knew everything. Perry was there. The defense counsel at the criminal trial had videotapes, CDs of Esker's and Perry's statements eight months before the trial. They had the actual phone records from Sprint. That's another reason that the criminal case got reversed, because the judge wouldn't allow in the records from Sprint of the actual telephone calls, not some spreadsheet, the actual calls, because she said there needed to be expert testimony on that. Well, that was one of the reasons it was reversed. But defense counsel had all of that information at least eight months before trial and, like I said, was involved at least as early as the point where they identified and interviewed the alibi witnesses that McKay had given them, which when they interviewed those alibi witnesses, none of whom testified at the criminal trial, by the way, one of the alibi witnesses was a store clerk where McKay had said, I was at this store on the night of the robbery when Boedinger, Rudolph, and I believe McKay's defense counsel went there to the store and interviewed that alibi witness the night of the robbery. She said that she knew McKay. He'd been coming in her store for a long time. He hadn't been there in months, and she had worked that night of the robbery, and she didn't see him in the store, and there was no video surveillance one way or the other. So that was all a part of this investigation that originally led to identification of McKay. The victim, who had plenty of time to observe the person robbing her, is this wasn't a quick thing. She observed him coming to the car. She observed him when she got in her trunk to get her purse. He put a gun in her face. She said she was looking right at him, kept her composure, got into the car at that point with whoever the robber was standing at her door leaning in over her while she went through her purse. She had ample opportunity to observe him and was just dead certain every time she identified McKay as her robber, and she's never wavered. Was Esker prosecuted for the Jane Doe robbery? No, he was not. Had the statute run, I don't know. I don't know, Your Honor, if the statute had run or not, but I know he at some point confessed to the murder of Boykin, but has never confessed to the robbery, never. But at the criminal trial, Perry testified that she didn't know McKay. She didn't know him. She didn't know who that was. But to the extent that everyone seems to just assume that Esker's also committed this robbery, that's also never been established. The reason McKay was not retried after the criminal case was reversed was because the victim at that point just refused to testify. She didn't recant. She refused to testify. There was apparently some media attention, and she had been through so much, and you can't prosecute without the witness. So to the extent that there has been allegations of an unreasonable investigation, it just doesn't meet the criteria of shocking the conscience. The three things that do shock the conscience, this Court has found, are things like police attempting to threaten or coerce the defendant, investigators purposefully ignoring evidence suggesting defendant's innocence, and evidence of systemic pressure to implicate the defendant in the face of contrary evidence. Well, isn't that kind of what McKay is arguing, is that they just ignored the Esker's evidence? That is what she is arguing. However, what you have to keep in mind is what happened then and what they knew then and that timeline. As soon as Boedinger and Rudolph were assigned to the case, they took the spreadsheet provided by Jane Doe to the extent that there were calls that were left off of that spreadsheet. The spreadsheet was provided by Doe. In investigating and running those numbers and whatever they do to see who has used the phone, that led Boedinger to McKay, and at that point there was a photo lineup. The victim identifies McKay clearly. McKay then turns himself in and is interviewed. At some point that interview is suspended. There is an in-person lineup arranged. Doe again comes and identifies McKay as the person who robbed her, and they went from there. They didn't have all of this evidence. There is no evidence in the record that establishes that they knew that anybody else committed this crime. They knew they had a crime. They knew it led to this suspect. They put him in a photo lineup. The victim identifies him. They put him in an in-person lineup. The victim identifies him. She is strong about that. At some point when they learn of Esker's, they put him in a photo lineup. The victim comes in and says, nope, this kind of looks like him, but here is why. It is not him, and it is the guy I identified before. There was no fabrication of evidence. There was no suppressing any exculpatory evidence. There is simply no record of that, no evidence of that in the record. And the district court found that in a very, I thought, thoughtful opinion, some 36 pages, where he went through each and every allegation. There is simply no evidence for this. And we believe that the district court should be affirmed on all findings. If you have no other questions, thank you, Your Honors. Thank you, Ms. Pinnicoff. Mr. Dooley. Thank you. May it please the Court. Your Honors, my name is Brent Dooley. I am representing one of the co-appellees in this case, the City of St. Louis, Missouri. The City asks the Court here today to affirm the district court's opinion in that the district court correctly entered summary judgment for the City because the summary judgment record clearly shows, as Ms. Pinnicoff just said, an absolute absence of evidence to support any theory of municipal liability against the City of St. Louis. And we ask the Court to affirm that for four basic reasons, four principal reasons. Number one, an absence of evidence of any official policy of the City of St. Louis. Number two, an absence of any evidence of a widespread or persistent custom by actors of the City of St. Louis. Third, an absence of any evidence of a failure to train or a failure to supervise on behalf of the City. And then finally, Your Honors, I mean, we ask the Court to affirm in that if the Court affirms the summary judgment on behalf of the police defendants, the City cannot be held liable if there's no constitutional violation. This case is a little bit unique as it relates to the municipal liability relationship between this governmental entity, the City of St. Louis, and the actors that are named as defendants in that the majority of the actions of the police that are complained of by the plaintiff happened before the City of St. Louis controlled its police department. So sort of a wrinkle in this is that it was not until September 1st of 2013 did the City of St. Louis get control of the police department. Before that, it was an entity of the State, the State of Missouri, that is. And we've briefed some of the issues related to the ordinance and the transfer of control between the City and the police department. And all of that is to say that the investigative activity that occurred before September 1st of 2013, all of which was the investigation in this particular case, was done while the police defendants were employees of the State, not of the City. In other words, the City didn't control or employ the police defendants until after all of their investigation into Mr. McKay. So as Your Honors are well aware, under 42 U.S.C. 1983, a municipality can only be held liable or cannot be held vicariously liable, I should say, for the unconstitutional acts of its employees unless those acts are done pursuant to an official policy or a widespread or persistent custom by the municipality. So the Supreme Court has told us that that policy has to be the moving force behind any constitutional violation. And moving force means deliberate action. So jumping into policy issues, Your Honors, there's just no evidence in the summary judgment record of any policy whatsoever of the City of St. Louis. Not one shred of evidence, not one policy document, nothing. So absent any evidence on that issue, we ask the courts to affirm the district court in finding that there was no municipal policy that led to any alleged constitutional violations. As to the custom, I think this Court's recent opinion in McVie-Raines is relatively instructive here where the Court explored two instances where there was evidence of a widespread or persistent custom of constitutional violations. And then also in Mick, the facts in Mick talked about how there was three affidavits submitted in that case of other examples of constitutional violations. And this Court found that that was insufficient to prove the type of widespread or persistent custom necessary to trigger Monell liability. In this case, we don't have any evidence of any other activities or any other evidence whatsoever of people other than Mr. McKay allegedly being subjected to some sort of constitutional deprivation as a result of a custom. This Court has held, of course, in Ulrich v. Pope County as well as Russell v. Hennepin County that a single isolated instance of misconduct cannot, as a matter of law, establish a municipal policy or custom. Now, I'm certainly not conceding that there was any misconduct in this case, but to the extent there is, one instance isn't enough. And here, the only evidence before the Court on that issue is this one instance, and that is the investigation of Mr. McKay. Again, there is no evidence related to any training or supervision issues in this case, nothing in the record whatsoever for the plaintiffs to proceed on a theory of failure to train or failure to supervise. That, of course, would require some deliberate indifference on behalf of policymaking officials of the city. Again, no evidence whatsoever of any of that. And then the last issue that I would address with Your Honors relates to the last thing that I said, which is that if there is no constitutional violation, then there can be no Monell liability or no municipal liability. And for that reason, we ask the Court to affirm the district court's opinion, granting summary judgment in favor of all the police defendants, and if the Court is so inclined, then it follows that the city can't be liable under any municipal liability theory if there was no constitutional violation. So I'm out of time. If there's no questions, I will yield. I see none. Thank you, Mr. Duda. Thank you, Your Honors. Ms. Barth, your rebuttal. Thank you, Your Honors. I have very limited time, but I did want to point out one case that is recent, the case of Russ Floria v. Lincoln County that Judge Ross decided in September of 2019. It's relevant, I believe, to this case, obviously, because it's the same judge who decided this case. Is this in your brief? No, this was just decided in September of 2019. Did you send us a 28-day letter? No, I'm sorry. I haven't. Well, if you'd do that, it would help. Okay, I will do that, Your Honor. But while I have time, I would like to point out that in Judge Ross denying qualified immunity and summary judgment to the investigating officers in Farrion, you might know this story of it's gotten some public publicity. Pam Hupp was the person who the entire investigation, the entire trial, the defendant believed was the actual perpetrator of the murder of his wife. And in Judge Ross's opinion, it's a shockingly similar case, but he came to the exact opposite conclusion for reasons that seem unclear. And what he quoted in his opinion was that every piece of evidence could equally, equally support the suspicion of Hupp. Now, in this case, every piece of evidence didn't equally point to Esther. It only pointed to Keith Esther's. There was no corroborating evidence except for this witness identification. There was no piece. The husband doesn't count? I'm sorry? The husband doesn't count? The husband doesn't. I'm not sure. The husband corroborated Ms. Doe, right? He also identified McKay. He identified McKay after he saw his photograph. After he saw his photograph, he said that might be the person. And so aside from a witness identification, the hard piece of evidence, the gun, who had the phone, who had the money, every piece of what you would call corroborating evidence for the witness identification did not point to Cornell McKay. It pointed to someone else. And what Judge Ross wrote was the investigators in the Feria case, the investigators ignored evidence pointing to Feria's innocence. That's the same thing that happened here. They ignored every piece of evidence that pointed toward Cornell McKay's innocence. They had, Cornell McKay had alibi witnesses. They said they weren't reliable. We're not going to believe them because the statements are too similar. And so I just wanted to point that out because the facts in that case, when he came to the exact opposite, and it was based upon a reckless investigation, I believe. I'm sorry. We'll review your submission. Thank you so much. Send that information to us. Thank you, Your Honors. Thank you. The Court thanks both counsel for the arguments you provided to us this morning  We will take the case under advisement. You may be excused. Madam Clerk, would you call case number three for the morning? Yes, Your Honor. Craig Coates et al. v. DeSalt Falcon Jet Corp.